Maureen ROCHE, Plaintiff,

v.

Peter O'MEARA, Charles Hamad, George Moore, Thomas Harris, William Ale, Thomas Palumbo, and Belinda Weaver, Defendants.

No. Civ.3:99CV02087 (AWT).

United States District Court,
D. Connecticut.

Sept. 27, 2001.

Peter A. Kelly, New Haven, CT, for plaintiff.

Holly Jean Bray, Attorney General's Office, hartford, CT, Margaret Quilter Chapple, Eleanor M. Mullen, Attorney General's Office, Hartford, CT, for defendants.

### RULING ON MOTION FOR SUMMARY JUDGMENT

THOMPSON, District Judge.

Plaintiff Maureen Roche ("Roche") brought this action against defendants Peter O'Meara ("O'Meara"), Charles Hamad ("Hamad"), George Moore ("Moore"), Thomas Harris ("Harris"), William Ale ("Ale"), Thomas Palumbo ("Palumbo") and Belinda Weaver ("Weaver") in five counts. Count One sets forth a claim pursuant to 42 U.S.C. § 1983 based on an alleged violation of Roche's rights to procedural due process and equal protection under the United States Constitution. Count Two alleges "a constitutional tort in violation of the 14th Amendment". Count Three al-

leges violation of Roche's rights to procedural due process and equal protection under Article 1, Sections 8 and 20 of the Connecticut Constitution. Count Four sets forth a claim for damages pursuant to Conn.Gen.Stat. § 19a–24. Count Five sets forth a common law claim for fraudulent inducement. The defendants have moved for summary judgment as to all counts on the grounds that there is no genuine issue of material fact and they are entitled to judgment as a matter of law on Counts One, Two and Three, that Count Four fails to state a claim upon which relief can be granted, and that the claims in Count Five are barred by the doctrine of sovereign immunity and by statutory immunity under Connecticut law. For the reasons set forth below, the motion is being granted as to all but one state law claim, and that claim is being dismissed without prejudice.

## I. FACTUAL BACKGROUND

The plaintiff is a registered nurse, licensed by the State of Connecticut. In or about the summer of 1998, the plaintiff saw a newspaper advertisement announcing an opening for a per diem nurse at Southbury Training School ("Southbury"). The plaintiff applied for the position, and was interviewed by defendant Ale and Esther McCoy.

The position advertised was for a per diem nurse at the "McCoy House". The McCoy House is a facility located on the grounds of Southbury, but administered independently. The McCoy House was established as the result of a consent decree entered on March 10, 1992, as part of a federal lawsuit brought by Leo and Esther McCoy. The McCoy House's sole purpose is to care for the two severely disabled McCoy children, William and Leo.

Pursuant to the consent decree which established the McCoy House, the McCoy parents were given extensive rights of participation in the care of William and Leo and the administration of the McCoy House. These rights include the right to approve the hiring of staff; to discharge case managers; to discharge advocates; to require William and Leo's physician to consult with them about the childrens' care; and to determine whether the McCoy House should be William and Leo's permanent residence. The parents were also considered under the consent decree to be "co-members" of the team responsible for William and Leo's care.[1]

Roche was hired as a per diem nurse and was employed in that position from September 4, 1998 through October 23, 1998. Roche was aware when she applied and when she was hired that the position was as a per diem nurse, not as a permanent nurse. Roche was scheduled to work on October 24 and October 25, 1998. However, Esther McCoy called the plaintiff and canceled her shifts for those days. The plaintiff was never scheduled to work another shift at the McCoy House.

The plaintiff made a number of phone calls to defendant Ale, the administrator in charge of the McCoy House, to discuss the fact that she had not been scheduled to work any shifts. Ale told Roche that "his

---

1. The court overseeing implementation of the consent decree determined at some point that there were serious problems in the administration of the McCoy House. In June 1998, a Special Master was appointed by the court to implement the consent decree and to make recommendations for improved administration of the McCoy House. The Special Master's report, which included recommen-

dations for reducing the role of the McCoy parents in running the House, especially in the area of staffing, was accepted by the court on March 14, 2000. *See McCoy v. Belmont*, 3:85CV00465 (JGM) (D.Conn.). Since that time, the Department of Mental Retardation has attempted to implement the Special Master's recommendations. The McCoy parents have resisted the changes.

hands were tied" (Roche Aff. ¶ 9) and suggested that she contact the Special Master charged with reviewing the implementation of the consent decree governing operation of the McCoy House. Roche contacted the Special Master, met with him, and explained her concerns.

On December 1, 1998 Roche was officially separated from state service. In February 1999, Roche received an official notice of separation, stating the reason for her unemployment as "voluntary leaving". Roche was angered by this, because she felt that it was not accurate to say that she had stopped working at the McCoy House voluntarily. Upon receiving the notice, Roche called defendant Harris and wrote him a letter detailing her complaints about the McCoy House and about the notice of separation she had received.

Throughout the time that Roche was employed at the McCoy House, she was covered by a collective bargaining agreement ("CBA") entered into by the State of Connecticut and the New England Health Care Employees Union District 1199; specifically, Roche was covered by Article 9, Section 20 of that Agreement.

The CBA provides that when the state decides to stop using the services of a per diem employee, the employee may request a "Sperl conference"; there is no explanation of what such a conference would entail, or what possible remedies, if any, a per diem employee could obtain through such a conference. The plaintiff never requested such a conference. The CBA grievance and arbitration provisions do not apply to per diem employees.

## II. *LEGAL STANDARD*

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c) (2000). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir.1994). Rule 56(c) "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548.

When ruling on a motion for summary judgment, the court must respect the province of the jury. The court, therefore, may not try issues of fact. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987); *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir. 1975). It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined ... to issue-finding; it does not extend to issue-resolution." *Gallo*, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is *both* genuine *and* related to a material fact. Therefore, the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." *Id.* As the Court observed in *Anderson:* "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id.* Thus, only those facts that *must* be decided in order to resolve a claim or defense will prevent summary judgment from being granted. When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses. Immaterial or minor facts will not prevent summary judgment. *See Howard v. Gleason Corp.,* 901 F.2d 1154, 1159 (2d Cir.1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and ... draw all reasonable inferences in its favor." *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000) (quoting *Del. & Hudson Ry. Co. v. Consol. Rail Corp.,* 902 F.2d 174, 177 (2d Cir.1990)). Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion. Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment. *Stern v. Trs. of Columbia Univ.,* 131 F.3d 305, 315 (2d Cir.1997) (quoting *W. World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d. Cir.1990)). Moreover, the "mere existence of a scintilla of evidence in support of the

[nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

Finally, the nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists. *See Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," *Weinstock,* 224 F.3d at 41, if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, which must "demonstrate more than some metaphysical doubt as to the material facts, ... [and] must come forward with specific facts showing that there is a genuine issue for trial." *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1072 (2d Cir.1993) (quotation marks, citations and emphasis omitted). Furthermore, "unsupported allegations do not create a material issue of fact." *Weinstock,* 224 F.3d at 41. If the nonmovant fails to meet this burden, summary judgment should be granted. The question then becomes: is there sufficient evidence to reasonably expect that a jury could return a verdict in favor of the nonmoving party. *See Anderson,* 477 U.S. at 248, 251, 106 S.Ct. 2505.

## III. *DISCUSSION*

### A. *Count One: 42 U.S.C. § 1983*

#### i. Procedural Due Process

 The plaintiff alleges in Count One that the defendants deprived her of her constitutional right to procedural due process when they terminated her employment.[2] "To prevail on this claim, the

---

2. The plaintiff's separation from state service was officially designated as "voluntary".

plaintiff must show that [she] possessed a protected liberty or property interest, and that [s]he was deprived of that interest without due process." *McMenemy v. City of Rochester,* 241 F.3d 279, 285–286 (2d Cir.2001) (internal citations and quotation marks omitted). The plaintiff contends that she had a property interest in her position as a per diem nurse at the McCoy House.[3]

A property interest arising out of public employment may result from an explicit or implicit understanding between the employer and the employee, a contract, formal or informal rules, policies and practices of the employer, or the course of dealing between the employer and the employee.

*Clark v. Mercado,* No. 98–7934, 1999 WL 373889, *2 (2d Cir.). "In the employment context, a property interest arises only where the state is barred, whether by statute or contract, from terminating (or not renewing) the employment relationship without cause." *S & D Maint. Co., Inc. v. Goldin,* 844 F.2d 962, 967 (2d Cir.1988).

The plaintiff's employment as a per diem nurse was governed by the CBA, which was between the union representing workers at Southbury Training School and the State. Article 9, Section 20 of the CBA deals with per diem employees. The CBA provides, in relevant part, as follows:

Individuals in per diem classifications will work on an intermittent basis. These classifications may be used by the State to provide coverage on a daily basis where an agency has been unable to recruit enough non per diem employees in the applicable classification series or due to absences of current staff. Individuals in per diem classifications shall not be entitled to retirement benefits, health insurance or life insurance benefits, paid leave, longevity or other economic benefits, except as provided below.

Pl.'s Ex. 1, CBA, Art. 9, § 20. This section further states that only the following articles of the CBA apply to per diem employees: 1, 2, 3, 4, 5, 6, 7, 40, 43, 44, 45, 46, and 47. Among the articles which are excluded, and therefore do not apply to per diem employees, are Article 32, which governs grievance and arbitration procedures, Article 16, which deals with layoffs, and Article 33, which reads, in relevant part, as follows:

No permanent employee or employee as provided in Article One Section Four, who has completed the Working Test Period shall be disciplined except for just cause. Discipline shall be defined as dismissal, demotion, suspension, reprimand or warning.

However, the plaintiff contends that she wanted to continue working, but was not able to because of Esther McCoy's refusal to schedule her for work. The defendants' motion assumes, *arguendo,* that the plaintiff's employment was constructively terminated. The court will assume the same for purposes of this motion.

3. Although the complaint does not mention substantive due process, the plaintiff argues in her opposition to the motion for summary judgment that the defendants also deprived her of her right to substantive due process. In the context of this case, the starting point of a substantive due process claim, like a procedural due process claim, is the deprivation of a constitutionally protected property right. *See Zahra v. Town of Southold,* 48 F.3d 674, 680 (2d Cir.1995) ("To state a substantive due process claim, a party must first establish that he had a valid 'property interest' in a benefit that was entitled to constitutional protection at the time he was deprived of that benefit."). Because the court finds that the plaintiff has failed to identify any constitutionally protected property right of which she was deprived, her substantive due process claim fails for the same reasons her procedural due process claim fails.

Pl.'s Ex. 1, CBA, Art. 33, § 1.[4]

Further, Article 9, Section 20 specifically addresses the termination of a per diem employee's services:

If an agency decides to end the use of a per diem employee, the agency will provide a Sperl conference, if requested by the employee. A representative of the Union may be present at the conference if such employee is a member of the Union.

Pl.'s Ex. 1, CBA, Art. 9, § 20.

■ It is clear from these provisions that per diem employees are not entitled to the same protections as permanent employees under the CBA. An employee has a property interest in his or her position only where he or she cannot be discharged in the absence of good cause. *See, e.g., Moffitt v. Town of Brookfield,* 950 F.2d 880 (2d Cir.1991) (finding that public employee had property interest in his job because he could only be discharged for good cause); *Stein v. Bd. of the City of New York,* 792 F.2d 13 (2d Cir.1986) (same). The CBA does not provide that per diem employees can be discharged only for just cause. To the contrary, the CBA explicitly excepts per diem employees from the CBA section imposing a "just cause" requirement for discipline or dismissal of permanent employees. Nor has the plaintiff presented evidence of any implicit or explicit understanding between her and the defendants requiring that she be discharged only for just cause.[5] Therefore, the court finds that the plaintiff did not have a constitu-

tionally protected property interest in her position as a per diem nurse.

The plaintiff also contends, in her opposition to the motion for summary judgment, that she had a property interest in "(1) receiving fair consideration for scheduling of her work shifts; (2) the collective bargaining agreement's guarantee that she would not be locked out; and (3) the federal constitutional guarantee of the Fifth Amendment's contract clause prohibiting impairment of contracts." Pl.'s Memo. in Opp. at 7.

■ First, the plaintiff did not have a property interest in the scheduling of her work shifts. *See Ezekwo v. NYC Health & Hosp. Corp.,* 940 F.2d 775, 782 (2d Cir. 1991) (the denial of a particular work assignment or employment benefit does not merit the protection of the Due Process Clause); *Hajjar v. Dayner,* 96 F.Supp.2d 142, 144–45 (D.Conn.2000) (collecting cases holding that an employee has a protected property right only in a position generally, not in a specific shift, assignment, or transfer).

■ Second, the "lockout" provision of the CBA does not apply to this situation. "A 'lockout' has been defined at common law as the cessation by the employer of the furnishing of work to employees in an effort to get for the employer more desirable terms." *Betts Cadillac Olds, Inc.,* 96 N.L.R.B. 268, 282–283, 1951 WL 9736 (1951) (internal citations and quotation marks omitted). The National Labor Re-

---

**4.** Article One Section Four concerns "temporary employees", which are defined as employees "hired to fill a temporary, durational or emergency position of six (6) months duration or the length of the absence of the Employee replaced, whichever is longer." Pl.'s Ex. 1, CBA, Art. 1, § 4. The plaintiff does not allege that she was a temporary employee as

defined in this section, and on the facts presented here, it does not appear that she was.

**5.** In addition, temporary, probationary, and substitute employees generally have no constitutionally protected property right in their positions. *See, e.g., Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

lations Board noted in *Betts* that varying definitions of the term had arisen, so that

> concepts as widely separated as a close-down to avoid property loss; a cessation of operations because sporadic strikes interfered with efficient operation; a shutdown in a fit of employer temper during an argument with a union repre-sentative and without purpose to inter-fere with union or concerted activity; and mass discharges in reprisal for un-ion activity have been described as "lockouts."

*Id.* at 283, 1951 WL 9736 (internal citations omitted). The applicable Connecticut stat-ute defines a lockout, for purposes of un-employment compensation, in similar terms. *See* Conn.Gen.Stat. § 31–236. The defendants' failure to schedule Roche for work, and their termination of her employment as a per diem nurse, did not constitute a "lockout". Therefore, the lockout provisions of the CBA are not rele-vant.

█ Third, any employment contract the plaintiff had was a contract for per diem employment, pursuant to which she was an at will employee. The defendants did not interfere with her ability to per-form this contract. They simply terminat-ed it, as was their right. Furthermore, the Contracts Clause "as its terms indicate, is directed against legislative action only." *Barrows v. Jackson*, 346 U.S. 249, 260, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). Over a century ago, the Supreme Court stated that

> In order to come within the provision of the constitution of the United States which declares that no state shall pass any law impairing the obligation of con-tracts, not only must the obligation of a contract have been impaired, but it must have been impaired *by a law of the state.* The prohibition is aimed at the *legisla-tive* power of the state, and not at the

decisions of its courts, or the acts of administrative or executive boards or of-ficers, or the doings of corporations or individuals.

*New Orleans Water–Works Co. v. La. Sug-ar Refining Co.,* 125 U.S. 18, 30, 8 S.Ct. 741, 31 L.Ed. 607 (1888) (emphasis added). The Contracts Clause is thus not implicat-ed by the actions of the defendants in this case.

The plaintiff has failed to show that she has a property interest which is protected by the Due Process Clause of the United States Constitution. Therefore, the defen-dants are entitled to summary judgment on the procedural due process claim set forth in Count One.

### ii. Equal Protection

█ The plaintiff also alleges in Count One that the defendants deprived her of her right to equal protection of the law because they "treated her differently from other similarly situated registered nurse per diem state employees". Compl. ¶ 12. However, she makes no factual allegations that support this claim. The plaintiff does not identify any similarly situated persons, nor does she specify how she was treated differently from any other person. A let-ter written by the plaintiff, attached to the plaintiff's memorandum in opposition [Doc. # 32] as Attachment B, does not refer to any differential treatment; in fact, it sug-gests that Roche felt many or all employ-ees at the McCoy House were treated badly. The plaintiff's affidavit [Doc. # 34] does not make any mention of her being treated differently from others. The plaintiff's memorandum in opposition does not address the equal protection claim.

█ To state a claim for violation of equal protection rights, "it is axiomatic that a plaintiff must allege that similarly situated persons have been treated differ-

ently." *Gagliardi v. Village of Pawling,* 18 F.3d 188, 193 (2d Cir.1994). Because the plaintiff has failed to even allege that she was treated differently from similarly situated persons, Count One fails to state a claim for violation of the plaintiff's equal protection rights. The defendants are therefore entitled to summary judgment on the equal protection claim set forth in Count One.

### B. *Count Two: Fourteenth Amendment*

Count Two alleges only that the actions which form the basis of the claim in Count One "comprise a constitutional tort in violation of the 14th amendment to the United States Constitution." Compl., Second Count, ¶ 6. This count incorporates by reference all of the pertinent allegations of Count One. The court has found that the defendants are entitled to summary judgment on Count One. Therefore, the court finds that the defendants are also entitled to summary judgment on Count Two, which relies entirely upon the same legal and factual arguments as does Count One.

### C. *Count Three: Connecticut State Constitution*

The plaintiff claims in Count Three that the defendants' actions violated her rights to due process and equal protection under Article 1, § 8 and § 20 of the Constitution of the State of Connecticut.

■■■■■ The parties agree that "[t]he due process provisions of the state and federal constitutions generally have the same meaning and impose similar constitutional limitations." *Keogh v. Bridgeport,* 187 Conn. 53, 444 A.2d 225, 230 (1982). Likewise, "[t]he equal protection provi-

sions of the federal and state constitutions have the same meaning and limitations." *Id.* at 232–33. The court has found that the defendants are entitled to summary judgment on the plaintiff's claims set forth in Count One that the defendants' actions violated her rights to due process and equal protection, and the plaintiff has not pointed to any pertinent case where the protections afforded by the Connecticut Constitution were found to be broader in scope than those afforded by the United States Constitution. Accordingly, the defendants are also entitled to summary judgment on the parallel state constitutional claims, for the reasons set forth above. Summary judgment is therefore being granted in favor of the defendants on Count Three in its entirety.

### D. *Count Four: Conn.Gen.Stat. § 19a–24*

■■■■ Count Four alleges that the defendants are liable in their official capacities for the actions complained of in Counts One, Two, Three and Five, pursuant to Conn.Gen.Stat. § 19a–24. The plaintiff stated in her opposition to the motion for summary judgment that "[t]he purpose of the fourth count is to give notice to the state that damages will be sought against defendants in their official capacities under the statute, which provides a waiver of sovereign immunity." Pl.'s Memo. in Opp. at 12. The plaintiff states that she "cannot seek to impose personal liability on defendants under this statute." [6] *Id.*

Section 19a–24 reads, in relevant part, as follows:

6. It appears that § 19a–24(c) allows actions against defendants in their individual capacities if their actions are "wanton or wilful". However, as the plaintiff does not argue that

Count Four applies to the defendants in their individual capacities, the court will address only the official capacity claims.

(a) Any claim for damages in excess of seven thousand five hundred dollars on account of any official act or omission of the Commissioner of Public Health or the Commissioner of Mental Retardation or any member of their staffs ... or any superintendent, director, employee or staff member of any chronic disease hospital or state training school or state mental retardation region shall be brought as a civil action against the commissioners in their official capacities....

(b) Neither the Commissioner of Public Health nor the Commissioner of Mental Retardation nor any member of their staffs, shall be held personally liable in any civil action for damages on account of any official act or omission of any superintendent, director, employee or staff member of any chronic disease hospital or state training school or state mental retardation region nor on account of any official act or omission....

Conn.Gen.Stat. § 19a–24 (West 2001).

 The statute is clear that any civil action arising out of the acts or omissions of employees of a state training school, such as Southbury, is to be brought only against the Commissioner of Mental Retardation. *See Duguay v. Hopkins*, 191 Conn. 222, 464 A.2d 45, 50 (1983) ("[T]he statute states that such actions 'shall' be brought against, among others, the commissioner of mental retardation. The word 'shall' connotes that the directive is mandatory.... The commissioner of mental retardation is the *only* state defendant named in § 19a–24 against whom suit could be brought in his official capacity for actions performed within the purview of this case.") (emphasis added). Pursuant to

this section, defendant O'Meara is therefore a proper defendant in this case; the other defendants are not.

Section 19a–24 does not create a cause of action; it simply codifies the State's agreement to waive sovereign immunity as to certain suits against the Commissioners of the Department of Public Health and the Department of Mental Retardation. Section 19a–24 does not make any particular act or omission actionable. Therefore, the court construes Count Four as intended only to give notice that the plaintiff seeks damages from the State of Connecticut by suing defendant O'Meara in his capacity as Commissioner of the Department of Mental Retardation on all counts, and the defendants are entitled to summary judgment on Count Four as it fails to state an independent claim upon which relief may be granted.

### E. *Count Five Fraudulent Inducement*

 The plaintiff alleges in Count Five that the defendants fraudulently induced her to accept employment as a per diem nurse at the McCoy House by representing that

as a state employee, she would be entitled to those rights and privileges of an employee in state service as prescribed by law; that she would be permitted to exercise her professional skill, training and experience in the position for which she was being hired; and that she would be working under the supervision of other state employees, including defendants Ale, Palumbo, Harris, Hamad, and Moore.

Compl., Fifth Count, § 15.[7] The defendants contend that this claim is barred,

---

7. The parties do not address the merits of this claim; the defendants' motion is limited to immunity arguments. However, the court notes that "[t]he essential elements of an ac-

tion in fraud ... are: (1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to

as to the defendants in their official capacities, by the doctrine of sovereign immunity, and as to the defendants in their individual capacities, by the statutory immunity provided by Conn.Gen.Stat. § 4–165.

As discussed above, in light of Conn. Gen.Stat. § 19a–24, only defendant O'Meara is a proper defendant in his official capacity. Therefore, summary judgment is granted in favor of defendants Hamad, Moore, Harris, Ale, Palumbo and Weaver on Count Five in their official capacities.

■ As to the defendants in their individual capacities, Conn.Gen.Stat. § 4–165 provides that "[n]o state officer or employee shall be personally liable for damage or injury, not wanton, reckless or malicious, caused in the discharge of his duties or within the scope of his employment." Conn.Gen.Stat. § 4–165 (West 2001). The defendants contend that the plaintiff has failed to show that any of their actions were "wanton, reckless or malicious" and that they are therefore entitled to statutory immunity from suit in their individual capacities.

■ The plaintiff does not make any specific allegations about any of the defendants individually. The complaint alleges that O'Meara is the Commissioner of the Department of Mental Retardation and that each of the other defendants is or was an employee of the Department. Count Five alleges that "defendants made, or permitted to be made, false representations which were intended to induce plaintiff" to accept employment as a per diem nurse at the McCoy House. Compl., Fifth Count, ¶ 15. However, "in order to over-

come sovereign immunity, the plaintiffs must do more than allege that the defendants' conduct was in excess of their statutory authority; they also must allege or otherwise establish facts that reasonably support those allegations." *Shay v. Rossi*, 253 Conn. 134, 749 A.2d 1147, 1168 (2000).

The complaint does not indicate whether each defendant was a supervisor, a co-worker, or an administrator. The complaint does not allege which defendants, if any, were involved in the hiring process or made statements to the plaintiff upon which she relied in accepting the position at the McCoy House. The plaintiff's affidavit states that Roche was interviewed for the position at the McCoy House only by defendant Ale and Esther McCoy. However, she does not claim that Ale made the comments which she alleges constituted fraudulent misrepresentation.

It is not enough for the plaintiff to allege that "the defendants", as an undifferentiated group, acted wantonly, recklessly or maliciously, or to allege that Ale conducted an interview with her without specifying what he said that was fraudulent. To overcome the immunity established by § 4–165, the plaintiff must make specific allegations of wanton, reckless or malicious behavior by each individual defendant. Absent such specific allegations, the defendants are each entitled to statutory immunity, and summary judgment will enter in favor of the defendants in their individual capacities on Count Five.

■ The court notes that the only claim remaining in this case is the claim for fraudulent inducement against defendant O'Meara in his official capacity. The Supreme Court has counseled that

induce the other party to act on it; and (4) that the latter did so act on it to his injury." *Miller v. Appleby,* 183 Conn. 51, 438 A.2d 811, 813 (1981). "A party's reliance upon anoth-

er's misrepresentation must be justifiable or reasonable." *Topf v. Warnaco, Inc.,* 942 F.Supp. 762, 768 (D.Conn.1996).

a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims. When the balance of these factors indicates that a case properly belongs in state court, *as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain,* the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice. *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) (emphasis added). *See also Lanza v. Merrill Lynch & Co.,* 154 F.3d 56, 61 (2d Cir.1998) (there are "notions of judicial economy and comity which militate against supplemental jurisdiction when the federal claims have been dismissed pre-trial."). Accordingly, the court declines to exercise jurisdiction over this sole remaining claim.

### IV. *Conclusion*

For the reasons stated above, the defendants' Motion for Summary Judgment [Doc. # 26] is hereby GRANTED as to Counts One, Two, Three and Four. The motion is also GRANTED as to Count Five as to all defendants in their individual capacities, and as to defendants Hamad, Moore, Harris, Ale, Palumbo and Weaver in their official capacities. The claim in Count Five against defendant O'Meara in his official capacity for fraudulent inducement is hereby DISMISSED, without prejudice.

The Clerk shall close this case.

It is so ordered.